IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

MINNIE FOXIE,

    Plaintiff,

v.

WAL-MART STORES EAST, LP,

    Defendant.

CIVIL ACTION FILE

No. 2:20-CV-00017-SCJ

## ORDER

This matter appears before the Court on Defendant's Motion for Summary Judgment (Doc. No. [52]).[1] Plaintiff responded in opposition (Doc. No. [56]), and Defendant replied (Doc. No. [57]). The Court rules as follows.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

I.  BACKGROUND

   A. **Factual Background**[2]

   *1. Plaintiff's Background*

On Thanksgiving Day 2018, Plaintiff—who was then 79 years old—went to Defendant's local store ("the store") with her adult grandchild to purchase a hoverboard. DSOMF 1-3, 6, 8, 11. In the newspaper, Defendant advertised a "Light Up Black Friday Sale" ("the sale"), with the front page stating that the sale began at 6 p.m. and including a photo of and information about a hoverboard.

---

[2] The Court derives the following facts from the Parties' submissions (Doc. Nos. [52-2] (Defendant's Statement of Material Facts, or "DSOMF"); [56-1] (Plaintiff's Response to DSOMF, or "RDSOMF"); [56-2] (Plaintiff's Statement of Additional Facts Which Are Material, or "PSOMF")) and the record.
   Pursuant to Local Rule 56.1(B), the Court will deem a fact admitted unless it is directly refuted with concise responses supported by specific citations to evidence, a party lodges a valid objection to admissibility, or the citation does not support the fact. Here, because Defendant failed to respond to PSOMF, the Court will ensure that such facts are supported by the citations before deeming them undisputed. See Reese v. Herbert, 527 F.3d 1253, 1269 (11th Cir. 2008) ("after deeming the movant's statement of undisputed facts to be admitted pursuant to Local Rule 56.1, the district court must then review the movant's citations to the record to 'determine if there is, indeed, no genuine issue of material fact.'"). When a fact is undisputed, the Court includes the fact.
   For disputed facts, the Court reviews the record to determine if a material dispute exists. Where the other party's response reflects the record cited more accurately, the Court modifies the proposed fact and cites the record. The Court also rules on objections to proposed facts and excludes immaterial facts, those stated as an issue or legal conclusion, those not supported by a citation to evidence, or those that the record citation fails to support. Finally, where appropriate, the Court includes facts drawn from its review of the record.

2

PSOMF 1. Plaintiff's granddaughter saw this advertisement and wanted to purchase a hoverboard for her son, so she and Plaintiff arrived at the store about 20 minutes before the sale. PSOMF 34, DSOMF 9-10. Plaintiff had never been to a holiday sale before, but was aware that sales on Thanksgiving Day, or "Black Friday sales," can be crowded and include aggressive patrons. DSOMF 4-5.

### 2. *Defendant's Black Friday Policies*

"It is generally known and a matter of judicial notice that holiday shopping retail sales may attract crowds." Doc. [57], 6. See also PSOMF 2. Indeed, Defendant has policies specifically aimed at controlling Black Friday shopping crowds. DSOMF 39. Defendant admits that one major Black Friday issue it faces are customers touching merchandise and trying to pick it up before sales start. Id.50; PSOMF 3-4. Defendant staffs to prevent this and encases products in plastic wrap before the commencement of the sale. PSOMF 5, 7. Defendant is aware that this plastic wrap can present a tripping hazard on the floor, so Defendant's policy is to cut and gather this plastic wrap prior to the commencement of the sale, thereby ensuring it doesn't hit the floor, and supply staff with trash bags to carry with them and collect it. Id. 5-10; DSOMF 56, 61.

Defendant's policy also requires that employees keep an eye on large and unruly crowds. DSOMF 69. The policy also requires that employees keep a lookout if customers begin to form around a pallet or PDQ item[3] prior to the commencement of the sale, protect it on all four sides, regain control of the area, and relay this information to a supervisor or a Quick Response Team ("QRT")[4]. PSOMF 11-12. If customers begin to touch the items prior to the commencement of the sale, Defendant employees are to interject and ask them to step away and wait for employees to remove plastic wrap. Id. 14-15; DSOMF 50. If customers refuse to obey, Defendant's policy requires that customer management associates ("CMA")[5] contact the command post for assistance from the QRT and law enforcement who must first surround the product and get the crowd back, then get the customers in an orderly line, and distribute the product in an orderly fashion. PSOMF 16, 18-19.

Additionally, Defendant has policies for pre-identifying certain sale items for which additional crowd control measures may be necessary. PSOMF 20. For

---

[3] It is unclear if the hoverboards were a pallet or PDQ item. Defendant's 30(b)(6) witness testified that "nothing in our store has a pallet." Doc. [52-8] (Wilson Dep. Tr.), 60:11-12.
[4] The QRT is eight Defendant employees who patrol the store to respond and react rapidly to crowd management issues and volatile situations. PSOMF 17
[5] Defendant placed CMAs in certain areas to do this. PSOMF 15.

those products that Defendant's home office pre-identifies as "hot items," Defendant employees are to put customers in a line prior to the sale's commencement and give each customer a numbered queue card to present to an employee to obtain the product one at a time. Id. Products may also be pre-identified at the store as "highly desirable" due to their price and availability and, for those products, Defendant employees are to place customers in spontaneous lines in relief areas, or less crowded parts of the store, to facilitate crowd management. PSOMF 21-22.

These measures are designed to prevent customers from grabbing product before the sale starts, tearing into the plastic wrap, and having it on the floor. Id. 24. Prior to working on Black Friday, employees take computer-based learning on Defendant's Black Friday policies. DSOMF 48.

### 3. *Defendant's Store Preparations for the Sale*

In preparation for the sale, Defendant's 30(b)(6) witness testified that the store assigned employees to certain areas to inform customers that the sale had not yet begun and hired 12 police officers for crowd control and security. DSOMF 40-41. He also testified that an eight-person QRT was on call that day, moving around the store with radios looking for issues. DSOMF 45.

5

Although the store developed a plan and map for the sale, they received an unexpected delivery on the day of the sale, which included the hoverboards. PSOMF 23, 25. They improvised an unwritten plan to put these items in the Garden Center. Id. 26.

There were six or seven employees assigned to the Garden Center, compared to five on a normal business day. DSOMF 46. Two CMAs, Kevin Love[6] and Cassandra Davis,[7] were assigned to the Garden area. Id. 52; PSOMF 29. Both had trash bags to collect plastic wrap and coordinated who would operate the register and monitor merchandise and crowd. DSOMF 54; PSOMF 32. Love's duties included keeping customers calm and cutting the plastic wrap. DSOMF 55.[8] Only Davis had a radio. PSOMF 31.

---

[6] Defendant's 30(b)(6) designee testified that Love completed the training necessary to work on Black Friday. DSOMF 49. However, it is disputed whether Love was trained specifically about what to do when customers remove plastic wrap or grab merchandise before a sale starts. Id. 59; PSOMF 43.

[7] Parties cited no evidence concerning whether Davis was also trained. See generally DSOMF and PSOMF.

[8] It is unclear if Davis was to work simultaneously with Love at cutting the plastic wrap and gathering it when the sale started. See DSOMF 55, 57.

### 4. *Thanksgiving 2018*

When Plaintiff arrived at the store, the hoverboards were stacked on the floor, wrapped in plastic wrap, and located in the Garden Center area[9], which was fenced in and had a policeman at the door. DSOMF 11-13, 44. Plaintiff and her granddaughter stood with others in front of items they were interested in, waiting for the sale to start and the plastic wrap to be removed from the items. Id. 14-16; PSOMF 36. Surveillance video shows 17 people around the stacks of merchandise three minutes before the sale began. PSOMF 13, 38.

Almost six full minutes before the start of the sale and before any Defendant employees began removing the plastic wrap, some customers began to pull the plastic wrap off the merchandise. Id. 37.[10] Love claims he told the crowd, including those around the hoverboards, to backup but "nobody was

---

[9] It is unclear if the hoverboards were an item for which Defendant's policies required pre-sale or spontaneous queuing. Defendant's 30(b)(6) designee denied that they were a highly desirable item. Wilson Dep. Tr., 91:8-10. However, he acknowledged that the Garden Area was a place to put highly desirable items and characterized items put there as "a hot item." PSOMF 23, 26. It is undisputed that the hoverboards sold out in 15 to 20 minutes. PSOMF 46. Another witness testified that, at a separate Atlanta-area store, Defendant imposed pre-sale queueing for the hoverboards. PSOMF 52. As a result, whether the hoverboards were a hot or highly desirable item is a disputed material fact.
[10] Although Defendant disputes this, the Court's review of the surveillance video reveals that some customers began to remove some plastic wrap around 5:53 P.M. See Doc. No. [52-3].

7

listening." Id. 40-41; DSOMF 59. Love walked away, out of the surveillance video frame, approximately two minutes before the sale started. PSOMF 46.[11] At no point did anyone ever make a call from the Garden Center about crowd issues. Id. 38, 42; DSOMF 75.

Plaintiff's granddaughter saw two Defendant employees taking the plastic wrap down and customers removing it and throwing it on the floor. DSOMF 21. After a man gave Plaintiff's granddaughter a hoverboard, she placed it in a cart and walked away towards register with Plaintiff following her a few feet behind. Id. 22, 27. Plaintiff saw another customer kicking plastic around but did not see it on the floor as she followed her granddaughter, when it caught around her leg, tripping her. Id. 23-26. The duration between when the crowd of customers began removing the plastic and Plaintiff tripped was less than a minute. Id. 29; PSOMF 49.

### B. Procedural Background

Plaintiff filed this action in the State Court of Forsyth County, Georgia on January 9, 2020. Doc. No. [1-1]. Plaintiff alleged that Defendant negligently

---

[11] Surveillance video shows two individuals wearing Walmart vests entering the camera frame around 6:00:13 PM and then departing again, out of the frame, at 6:00:25 PM. Id.

allowed the plastic wrap to drop to the floor, which caused Plaintiff to fall and sustain injuries. Id. ¶¶ 5–10. Defendant removed the action to this Court on January 22, 2020. Doc. No. [1]. After discovery closed, Defendant moved for summary judgment. Doc. No. [52]. Plaintiff responded in opposition (Doc. No. [56]), and Defendant replied (Doc. No. [57]). This matter is now ripe for review, and the Court rules as follows.

### C. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co.,

357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing' — that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the non-movant's favor. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine dispute for trial. Fitzpatrick, 2 F.3d at 1115 (citations omitted).

### D. ANALYSIS

In Georgia, "[w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary care in keeping the premises and approaches safe." Ga. Code. Ann. § 51-3-1 (2021). Therefore, "[p]remises liability [in a slip and fall case] lies at the intersection of tort law and property law" and, to recover, a plaintiff-invitee must show that he was injured by a hazard on the defendant-landowner's premises that the defendant "should have removed in the exercise of ordinary care for the safety of the invited public." Am. Multi-Cinema, Inc. v. Brown, 285 Ga. 442, 444, 679 S.E.2d 25, 27 (2009). "Determining whether a hazardous condition exists is a threshold question in a slip and fall case." Shannon v. Omni Hotel Mgmt. Corp., No. 1:09-CV-471-RLV, 2010 WL 11597056, *4 (N.D. Ga. Aug. 3, 2010) (citing Flagstar v. Burch, 267 Ga. App. 856, 600 S.E.2d 834 (2004)). Here, neither Party disputes that the plastic wrap on the store floor presents a tripping hazard.

So, the question is whether: (1) the defendant had actual or constructive knowledge of the hazard; and (2) the plaintiff lacked knowledge of the hazard

11

despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier. See Haskins v. Piggly Wiggly S., Inc., 230 Ga. App. 350, 351, 496 S.E.2d 471, 473 (1998) (citing Robinson v. Kroger Co., 268 Ga. 735, 748–749, 493 S.E.2d 403 (1997)). Under Georgia law, premises liability claims generally hinge on matters of fact — which must be resolved by a jury — and courts should only resolve them as a matter of law, on summary judgment, "when the evidence is plain, palpable, and undisputed." Robinson, 493 S.E.2d at 414. See also Am. Multi-Cinema, Inc., 679 S.E.2d at 28.

Here, Plaintiff's theory of premises liability posits that Defendant knew that crowds at the sale often tore into plastic wrap and left it on floor, causing a tripping hazard, had policies to ameliorate this hazard, and failed to fully adhere to them. Doc. No. [56], 21. Defendant claims that Plaintiff cannot show that Defendant possessed superior knowledge of any hazard or failed to operate the store safely during the sale. Doc. No. [52-1], 12-17.

### A. Parties' Knowledge of the Hazard

Defendant claims that "both Plaintiff and her caregiver granddaughter had actual knowledge concurrently" with Defendant about customers tearing into the plastic wrap and dropping it on the floor. Doc. No. [52-1], 13. Plaintiff claims that

Defendant had a "'reasonable apprehension' that its Black Friday customers would rip into the merchandise and drop plastic wrap on the floor prior to the sale beginning and cause a tripping hazard for other customers[.]" Doc. No. [56], 11 (quoting Bishop v. Mangal Bhai Enters., Inc., 194 Ga. App. 874, 876, 392 S.E.2d 535, 538 (1990). However, "[t]he true basis of a proprietor's liability for personal injury to an invitee is the proprietor's *superior* knowledge of a condition that may expose the invitees to an unreasonable risk of harm." Conner v. Norman Sosebee Funeral Home, 303 Ga. App. 352, 356, 693 S.E.2d 534, 538 (2010) (citation omitted) (emphasis added).

Here, it is undisputed that Plaintiff had never been to a Black Friday sale, but knew, generally, that they could be crowded. DSOMF 4-5. It is also undisputed that Defendant knew the general dangers of crowded Black Friday sales, which include customers touching merchandise and trying to pick it up before sales start. Doc. No. [57], 6. See also PSOMF 2-4, 39; DSOMF 5. Defendant's awareness is reflected in ameliorative policies or guidelines which staffing people to prevent this and encasing products in plastic wrap before the commencement of the sale. PSOMF 5, 7. Defendant was also aware of the specific danger of customers tearing into the plastic wrap around merchandise and

13

dropping it on the floor because it has a written policy to cut and gather this plastic wrap prior to the commencement of the sale, to ensure it doesn't collect on the floor, and supplies staff with trash bags to carry with them and collect it. Id. 6, 8-10; DSOMF 56, 61.

Whether Defendant knew that the hoverboards would generate crowds at the store for the sale is disputed. It is disputed whether Defendant considered the hoverboards a highly desirable item for which certain crowd control precautions (such as additional space and staff) were necessary or advisable under Defendant's policies or guidelines. PSOMF 11-12, 14-16, 18-19. On the one hand, Defendant featured the hoverboards prominently on their sale advertisement, on the other hand there is no evidence that they were pre-designated as a hot item. PSOMF 1, 20. Likewise, the store made a last-minute decision to put the hoverboards in a location that Defendant acknowledged was preferable for hot or highly desirable items, which was also the available space in their written plan when they arrived unexpectedly on the day of the sale. PSOMF 21-23, 25-26.

Lastly, it is undisputed that both Parties saw customers tearing off plastic wrap before the sale started. PSOMF 37, 40-41; DSOMF 21, 23, 25-26, 49. However, the Parties' respective knowledge about the presence and duration of

plastic wrap on the floor around Plaintiff in the moments before she tripped is disputed. Plaintiff saw another customer kicking plastic around but did not see it on the floor as she followed her granddaughter or when it caught on her leg, tripping her. DSOMF 23, 25-26; PSOMF 49. The duration between when the crowd of customers began removing the plastic wrap and Plaintiff tripped was less than a minute. DSOMF at 29; PSOMF 49. Parties cited no evidence concerning whether Defendant employees saw the plastic on the floor before it tripped Plaintiff. See generally DSOMF and PSOMF.

Consequently, the undisputed material facts establish that Defendant had superior general knowledge about the hazards posed by plastic wrap falling on the floor during the sale, but neither Party had actual, specific knowledge about the presence of the plastic on the floor that tripped Plaintiff. Accordingly, the Court "must determine whether a genuine issue of material fact remains as to [their] constructive knowledge." Smith v. Walmart Stores East, LP, 21-11116, 2022 WL 320839, *3 (11th Cir. Feb. 3, 2022) (citing Food Lion, Inc., v. Walker, 290 Ga. App. 574, 576, 660 S.E.2d 426, 428 (2008)).

### B. Defendant's Reasonable Inspection

"Constructive knowledge may be inferred when there is evidence that the owner lacked a reasonable inspection procedure." Gibson v. Halpern Enters., 288 Ga. App. 790, 791, 655 S.E.2d 624, 626 (2007) (quotation marks and citation omitted). On summary judgment, the defendant has the initial burden of showing that it had a reasonable inspection procedure that was *both* in place and being followed at the time of the incident. Shepard v. Winn Dixie Stores, Inc., 241 Ga. App. 746, 748, 527 S.E.2d 36, 38 (1999); see also Higgins v. Food Lion, Inc., 254 Ga. App. 221, 222, 561 S.E.2d 440, 442 (2002) ("The evidence must establish an adherence to customary inspection and cleaning procedures on the day in question and not simply that such procedures exist."). Doc. No. [52-1], 13.

It is undisputed that Defendant has specific policies and guidelines for Black Friday, including those pertaining to removing and collecting plastic wrap on merchandise, the placement of merchandise, and additional staffing to protect against hazards caused by overzealous customers. See supra I.A.2. The reasonableness of Defendant's policies is undisputed; the Parties dispute the only their applicability and Defendant's adherence. See generally Doc. Nos. [52-1]; [56]; [57]. Specifically, Defendant contends that it followed the requisite policies

16

but, because the plastic wrap was only on the floor for a short time, its employees did not have a reasonable opportunity to remove the hazard. Doc. No. [52-1], 22. Plaintiff claims that, if Defendant had adhered to its policies, it would have proactively prevented customers from removing the plastic wrap that fell to the floor and tripped her. Doc. No. [56], 12.

It is undisputed that the plastic wrap that tripped Plaintiff was only on the floor for, at most, a few minutes. DSOMF 23, 25-26; PSOMF 49. "But 'a plaintiff need not show how long a substance has been on the floor unless the defendant has established that reasonable inspection procedures were in place and followed . . .'" Smith, 2022 WL 320839, *3 (quoting Straughter v. J. H. Harvey Co., Inc., Ga. App., 232 Ga. App. 29, 31, 500 S.E.2d 353, 355 (1998)). Additionally,

> [t]he length of time the substance must remain on the floor before the owner should have discovered it and what constitutes a reasonable inspection procedure vary with each case, depending on the nature of the business, the size of the store, the number of customers, the nature of the dangerous condition, and the store's location.

Nealy v. Wal-Mart Stores E., LP, No. 1:19-CV-01379-AT, 2021 WL 3398145, *10 (N.D. Ga. Jan. 26, 2021) (internal citations omitted). Because it was Black Friday and Defendant has special policies to mitigate additional hazards caused by large crowds clamoring for steeply discounted merchandise during a short time frame,

the length of time the plastic wrap was on the floor is less probative than other inspection factors like the number of staff on hand, their training, and the resources at their disposal for preventative and proactive crowd control.

Here, material disputed facts remain concerning whether the hoverboards were a pallet/PDQ, highly desirable, or hot item for which Defendant's policies required particular crowd control measures. See supra fn. 1, 9. Although Defendant's 30(b)(6) witness claims they were not a hot or highly desirable item his testimony was equivocating and the fact that they were prominently advertised in the sale literature, placed in a location ideal for a highly desirable item, and quickly sold out suggests some knowledge, on Defendant's part, that hoverboards would garner crowds. See generally PSOMF 11-12, 23, 26, 46, 52. Taken together and in the light most favorable to Plaintiff, these disputed facts preclude a finding that the hoverboards were like any other sale merchandise and exempt from particular policies for pallet/PDQ, hot, or highly desirable items. As a result, material disputed facts also remain concerning whether proper procedures for pallet/PDQ, hot, or highly desirable items—such as queuing, surrounding, and escalation to supervisors and QRT—were followed. PSOMF 11-12, 14-22; DSOMF 50.

It is disputed whether Defendant sufficiently staffed, trained, and resourced employees assigned to the Garden Area so they could adhere to these policies and procedures. Defendant assigned the Garden Center: one additional staff member (DSOMF 46); two CMAs (DSOMF 52; PSOMF 29); and one policeman (DSOMF 44). It is undisputed that the hoverboards and other hot items were only placed in the Garden Area a few hours before the sale. (PSOMF 23, 25-26). It is also undisputed that the only staff around them—two CMAs—were simultaneously engaged in other duties besides crowd management. DSOMF 54-55, 57; PSOMF 32. Moreover, only one of these CMAs had a radio enabling her to communicate with the roving QRT team for backup. DSOMF 45-46, 52, 75; PSOMF 16-19, 29, 31, 38, 42. Additionally, it is disputed whether the CMAs assigned to the Garden Center received training about certain Black Friday crowd control measures. See supra fn. 6-7 (citing DSOMF 48-49, 52, 59; PSOMF 11-12, 17, 29, 43. It is undisputed that no call was ever made from the Garden enter about crowd issues. DSOMF 75; PSOMF 38, 42. Taken together in the light most favorable to Plaintiff, these material facts—and all the relevant inferences that can be drawn from them—present lingering questions about whether Defendant sufficiently trained, staffed, and supplied Garden Center

employees to respond to Black Friday customers who refused to obey employee instructions concerning the hoverboards. DSOMF 59; PSOMF 40-41.

Consequently, "a jury could reasonably conclude that Walmart's inspection procedures, the reasonableness of which is not disputed, were 'not followed at the time of the incident.'" Smith, 2022 WL 320839, *3 (citing Straughter, 232 Ga. App. 31, 500 S.E.2d, 355); see also Owens v. Larry Franklin Properties, Inc., __ S.E.2d__, 2022 WL 590679 (Ga. App. Feb. 28, 2022) (reversing grant of summary judgment on plaintiffs' negligence claims related to premises liability because issues of material fact remained where there was evidence that defendant had superior knowledge of the hazard which preventative treatment may have deterred).

### E. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment (Doc. No. [52]).

**IT IS SO ORDERED** this ___14th___ day of March, 2022.

_____
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE